UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GU SEON SONG,

                *Plaintiff,*

- against -

SHINHAN BANK AMERICA,

                *Defendant.*

Case No.:

**COMPLAINT**

Plaintiff Gu Seon Song, by and through his attorneys, Jung & Associates, P.C., alleges as follows:

## THE PARTIES

1. Plaintiff, Gu Seon Song, is a former employee of Shinhan Bank America and is a California resident.

2. Defendant, Shinhan Bank America ("Shinhan") is a New York Chartered Bank headquartered in New York City and is a wholly owned subsidiary of Shinhan Bank in Republic of Korea ("Shinhan Korea").

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 12 U.S.C. § 1831j (Depository Institution Employee Protection Remedy) and 28 U.S.C. § 1331 (Federal Question). Supplemental jurisdiction over Plaintiff's state law claims is conferred by 28 U.S.C. § 1367(a).

4. Venue is proper in this District under 28 U.S.C. § 391(b) and (c) because all or a

substantial part of the events or omissions giving rise to the claims occurred in this district, Defendant operates its business in this district, and Plaintiff was employed by Defendant in this district.

### FACTUAL BACKGROUNDS

5. Plaintiff worked for Shinhan from July 2001 to March 2020.

6. Upon information and belief, during its 2016 examination and audit of Shinhan, the Federal Deposit Insurance Corporation ("FDIC") discovered numerous violations of Bank Secrecy Act ("BSA")/Anti-Money Laundering ("AML") Compliance Program.

7. In June 2017, Shinhan and the FDIC agreed to the issuance of the Consent Order (the "Consent Order") for Shinhan to remedy the problems and be compliant with the prescribed regulations.

8. Pursuant to the Consent Order, Shinhan promised to improve and remedy Shinhan's BSA/AML Program (the "Remedial Projects") in a timely manner.

9. In the Consent Order, the FDIC reserved its rights to take appropriate adversarial actions against Shinhan where necessary.

10. Accordingly, time was of the essence in terms of Shinhan having the need to take necessary actions and completing the Remedial Projects promptly. Any failure or non-compliance on the part of Shinhan would allow FDIC to take adversarial actions against Shinhan, such as imposing substantial amount of civil penalties and/or issuing cease and desist orders.

11. Upon information and belief, as Shinhan was slow in making progress for the execution of Remedial Projects, Shinhan Korea, the parent company of Shinhan, dispatched Mr. Tae Won Suh ("Mr. Suh") and other employees of Shinhan Korea to Shinhan in New

York in or around May 2018 in an effort to expedite the progress in the Remedial Projects.

12. After Mr. Suh became the CEO of Shinhan in January 2019, Plaintiff was appointed to the position of the Chief Audit Executive ("CAE") in the same month.

13. Plaintiff's duty as the CAE included, but not limited to, conducting/overseeing internal audit activities and preparation of the internal audit reports.

14. Despite personnel changes, Shinhan was still lagging behind the schedule for the timely execution of the Remedial Projects.

15. Upon information and belief, one of the main reasons for the slow progress in the Remedial Projects was a high turnover rate of the BSA Officer in charge of Shinhan's BSA/AML program. During the first eight (8) months in 2019, the BSA officer had been replaced 4 times (including an acting BSA Officer) for various reasons to be articulated.

16. Because of the high rate of turnovers at the critically important position, follow-up works on the ongoing Remedial Projects were being delayed. Upon information and belief, some of Shinhan employees assigned to the Remedial Projects lacked the knowledge or expertise necessary to carry out the Remedial Projects.

17. For example, in 2018, Shinhan retained Ernst and Young for the 2017 BSA/AML Risk Assessment ("2017 Risk Assessment"). However, in 2019, Mr. Suh wanted the in-house staffs to conduct the 2018 BSA/AML Risk Assessment in place of Ernst and Young or any other consultancy firm having the requisite expertise for the Projects.

18. Mr. Suh organized a new team consisting of its own staff from within in order to do the 2018 BSA/AML Risk Assessment and the new team prepared the 2018 BSA/AML Risk

Assessment (the "2018 BSA/AML Risk Assessment"). Subsequently, the in-house staff completed the 2018 BSA/AML Risk Assessment reports in May 2019.

19. Mr. Suh, an implant from Korea, bragged that this was an achievement because Shinhan saved money by utilizing its in-house staff.

20. However, it was later learned the 2018 BSA/AML Risk Assessment prepared by the in-house staff had numerous flaws in it as a result of the lack of understanding on the subject matter and of poor management.

21. The Internal Auditor from Grant Thornton ("GT"), Shinhan's outsourced internal audit service provider, criticized the flaws in the 2018 BSA/AML Risk Assessment.

22. In 2019, Shinhan's Internal Audit Department conducted three internal audits in order to assess Shinhan's compliance with the BSA/AML mandates. It was done pursuant to Shinhan's three-year audit plan which had been approved by the Audit Committee in 2018. The three year audit plan encompassed the following areas -- Know Your Customer ("KYC"), Transaction Monitoring ("TM"), and Office of Foreign Asset Control ("OFAC").

23. In the KYC Internal Audit Report which was prepared in the 2nd quarter of 2019, the internal auditor from GT (the "GT Auditor") concluded that Shinhan's BSA/AML program is unsatisfactory and one of the main causes of such a conclusion is inappropriate management oversight and high turnover of the BSA Officer.

24. Mr. Suh was unhappy with GT's critical assessment of Shinhan's internal effort and the blunt conclusion. Mr. Suh protested to the GT Auditor and Plaintiff, the Chief Audit Executive of Shinhan at the time, that he did not like GT's conclusion and asked to exclude or cut back on some of the problems the GT Auditor discovered and articulated.

25. Mr. Suh also specifically requested that the KYC Internal Audit Report be revised to include Shinhan's efforts to hire a qualified BSA officer, which the GT Auditor and Plaintiff later agreed to do.

26. However, the GT Auditor and Plaintiff refused to change the conclusion of the KYC Internal Audit report against the wishes of Mr. Suh.

27. In the TM Internal Audit Report which was also prepared for the 2nd quarter of 2019, the GT Auditor concluded that the 2018 BSA/AML Risk Assessment had numerous flaws. Mr. Suh then asked Plaintiff to exclude GT Auditor's negative findings about the numerous flaws. To make sure, Plaintiff reviewed the 2018 BSA/AML Risk Assessment again and concluded that the GT Auditor's findings were correct.

28. Therefore, Plaintiff refused to accommodate Mr. Suh's request and decided not to exclude the GT Auditor's finding that the 2018 BSA/AML Risk Assessment included numerous flaws. The BSA Officer also agreed that the BSA/AML Risk Assessment contained many incorrect analyses. The GT Auditor and Plaintiff finalized the TM Internal Audit Report as originally written and presented it to the Audit Committee.

29. After the TM Internal Audit Report was presented to the Audit Committee, Mr. Suh expressed his anger and frustration again.

30. Upon information and belief, Shinhan submitted the 2019 Second Quarter BSA/AML Remediation Progress Quarterly Report (the "BSA/AML Report") prepared by Shinhan's own staff to the FDIC sometime in the beginning of the 3rd quarter in 2019.

31. Upon information and belief, in the BSA/AML Report, Shinhan represented that it satisfied and complied with some of the remedial mandates articulated in the Consent Order.

32. Upon information and belief, FDIC conducted an interim on-site Examination of Shinhan in August 2019 (the "Examination") in order to examine the status of Shinhan's compliance with the items articulated for remedial actions set forth in the Consent Order.

33. The Examination also included the review of the progress on the MRBA (Matters Requiring Board Attention) items mentioned in the previous Examination Report.

34. During the Examination, Mr. Noa Rosenthal, a FDIC examiner, requested internal audit reports of Shinhan.

35. Plaintiff submitted the KYC Internal Audit Report as well as the TM Internal Audit Report (the "Internal Audit Reports") to Mr. Rosenthal via email on or about August 27, 2019.

36. As the Chief Audit Executive, Plaintiff had a duty to provide the Internal Audit Reports to the FDIC's examiner upon his request, even though Plaintiff knew that the Internal Audit Reports made explicit references to Shinhan's many potential violations of Bank Secrecy Act (Section 352) and FDIC Rules and Regulation 326.8 including:

(1) Management: Bank should maintain qualified BSA officer, but there were 4 BSA Officers changes between the end of 2018 and May 2019, which hindered the Bank's effective BSA/AML program;
(2) Development of internal policies, procedures and processes: flaws and gaps in the policies and procedures; non-conformities of the program;
(3) Ineffective obtaining customer identification and maintaining records due to no customer identification documents repository;
(4) Foreign Banking Institution (Shinhan Indo Financial): lack of appropriate customer due diligence;
(5) Coverage gaps in the Bank's Transaction Monitoring system: some products and services were not covered;
(6) Incomplete annual/periodic customer due diligence: there were cases that the periodic customer due diligence were not performed;
(7) Risk Assessment: the 2018 BSA/AML Risk Assessment included incorrect narrative and calculation errors;

    (8) Ineffective Quality Assurance (QA) program: inappropriate quality assurance program and ineffective practice; and
    (9) Other several non-conformities of internal BSA/AML policies and procedures.

37. After Plaintiff had submitted the Internal Audit Reports to the FDIC, Plaintiff received a phone call from Mr. Suh and Jeong Hoon Cho ("Mr. Cho"), the Executive Vice President of Shinhan. Mr. Suh and Mr. Cho, reprimanded Plaintiff for submitting the Internal Audit Reports to FDIC, which inevitably would put Shinhan in serious trouble.

38. Upon information and belief, the FDIC considered the Internal Audit Reports by the independent third party, Grant Thornton more reliable representation of Shinhan's compliance status than the 2018 BSA/AML Risk Assessment and the BSA/AML Report prepared by Shinhan's own internal staff.

39. Upon information and belief, after the Examination, the FDIC concluded that Shinhan failed to satisfy some of the requirements set forth in the Consent Order, which Shinhan America had represented to have satisfied in in the BSA/AML Report.

40. Upon information and belief, after the Examination, the FDIC concluded that Shinhan America did not make a meaningful progress in the Remedial Projects. The FDIC also concluded that the quality of Shinhan's BSA/AML Program had been somewhat degraded.

41. After the FDIC made negative determinations against Shinhan America's BSA/AML Program, Mr. Suh and other executive officers specifically dispatched from Korea to handle the Consent Order related matters, started harassing Plaintiff on several occasions at group meetings such as the Senior Managers meetings and the Management Compliance Committee meetings.

42. They blamed Plaintiff for his submission of the Internal Audit Reports to the FDIC's examiner, which later served to disclose many internal problems Shinhan had been grappling with.

43. Mr. Suh and Mr. Cho repeatedly stated that before Plaintiff provided the FDIC examiner with the Internal Audit Reports, the FDIC examiner had been friendly with them.

44. They concluded that the FDIC examiner's attitude toward them completely changed as a result of Plaintiff submission of the Internal Audit Reports.

45. Between late 2019 and early 2020, Shinhan's fear about potential adversarial actions by the FDIC intensified as the Internal Audit Reports shed light on the lack of Shinhan's meaningful progress in the Remedial Projects.

46. In addition, upon information and belief, during Shinhan America's meetings and communications with the New York State Department of Financial Services (the "NYSDFS"), the NYSDFS also informed Shinhan that it was not satisfied with Shinhan's progress in the Remedial Projects.

47. Upon information and belief, Shinhan's executive officers became increasingly concerned that the NYSDFS would take more severe actions against Shinhan based on the FDIC's adverse findings of numerous violations after the Examination.

48. Upon information and belief, in the beginning of 2020, Shinhan Korea took the New York situation very seriously and became disappointed with Shinhan, Mr. Suh and Mr. Cho. Mr. Suh and Mr. Cho blamed Plaintiff for doing what he is legally required to do, the submission of untainted Internal Audit Reports to the FDIC.

49. In mid March 2020, when the FDIC's annual regulatory examination was almost completed, Shinhan terminated Plaintiff. Plaintiff received a verbal termination notice from Mr. Uhyun Nam ("Mr. Nam"), a HR manager.

50. Mr. Nam told Plaintiff that Shinhan was terminating him because of his submission of the Internal Audit Reports to FDIC. No other reason was given by Mr. Nam to Plaintiff for termination.

## FIRST CAUSE OF ACTION (VIOLATION OF 12 U.S.C. § 1831j)

51. 12 U.S.C. § 1831j (a)(1)(A) states that

    "No insured depository institution may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee (or any person acting pursuant to the request of the employee) provided information to any Federal banking agency or to the Attorney General regarding--

    (A) a possible violation of any law or regulation;"

52. Shinhan terminated Plaintiff because Plaintiff provided the Internal Audit Reports which included information implicating Shinhan's possible violation(s) of Bank Secrecy Act § 352 and FDIC Rules and Regulation § 326.8.

53. Shinhan violated 12 U.S.C. § 1831j (a)(1)(A).

54. Plaintiff suffered damages as a result of Shinhan's wrongful termination.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendant by:

1. Awarding Plaintiff compensatory damages in the amount of $500,000;

2. Taking other appropriate actions to remedy any past discrimination; and

3. All such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by a jury.

Dated: New York, New York
December 30, 2021

/s/Henry Hong Jung\_\_\_\_
Henry Hong Jung, Esq.
JUNG & ASSOCIATES, PC
*Attorneys for Plaintiff*
470 Park Avenue South, Suite 7 North
New York, New York 10016
Tel: (212) 481-0800
Fax: (212) 481-0820